JOHN J. BARRY (JJB 0246)
CLAPP & EISENBERG
A Professional Corporation
One Newark Center
Newark, New Jersey 07102
(201) 642-3900

LEON FRIEDMAN
148 East 78th Street
New York, N.Y. 10021
(212) 737-0400

Attorneys for Plaintiffs

FILED

MAY 4 1993

AT 8:30 _____M
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

DONALD J. TRUMP, THE TRUMP
ORGANIZATION, TRUMP'S CASTLE
ASSOCIATES, TRUMP PLAZA
ASSOCIATES, and TRUMP TAJ MAHAL
ASSOCIATES,

    Plaintiffs,

vs.

BRUCE BABBITT, Secretary of the
Interior, and ANTHONY HOPE,
Chairman of the National Indian
Gaming Commission,

    Defendants.

Civil Action No. 93-1882(NHP)

**FIRST AMENDED COMPLAINT**

---

Plaintiffs, by their attorneys, for their complaint, allege as follows:

**INTRODUCTION**

1. Plaintiff, Donald J. Trump, resides at 725 Fifth Avenue, New York, New York. Plaintiff, The Trump Organization, has its principal place of business at 725 Fifth Avenue, New York, New

York. Plaintiff, Trump's Castle Associates ("Trump's Castle"), has its principal place of business at Huron Avenue and Brigantine Boulevard, Atlantic City, New Jersey. Plaintiff, Trump Plaza Associates ("Trump Plaza"), has its principal place of business at The Boardwalk at Mississippi Avenue, Atlantic City, New Jersey. Plaintiff, Trump Taj Mahal Associates ("Trump Taj Mahal"), has its principal place of business at 1000 Boardwalk at Virginia Avenue, Atlantic City, New Jersey. Defendant, Bruce Babbitt, sued in his official capacity, is the Secretary of Interior and his official place of business is at the Department of The Interior, 1840 C Street, N.W., Washington, D.C. Defendant, Anthony Hope, sued in his official capacity, is the Chairman of the National Indian Gaming Commission and his official place of business is at the Commission's Office, 1850 M Street, N.W., Suite 250, Washington, D.C.

  2. This is an action for a declaratory judgment and to enjoin the operation and enforcement of certain sections of the Indian Gaming Regulatory Act (25 U.S.C. §2701 et seq.)("IGRA") on the ground that the law is unconstitutional under the Tenth Amendment to the United States Constitution.

  3. As is more fully alleged below, IGRA, the law in question, mandates that the states enter into certain compacts authorizing the creation and operation of gambling enterprises with any group deemed by defendants to constitute a recognized Indian tribe. Pursuant to each such compelled gambling compact, the

-2-

recognized tribe must be permitted to conduct gambling activities on any lands within a state deemed by defendants to constitute an Indian reservation or tribal lands, even if those gambling activities: (a) are otherwise prohibited by state law; (b) are contrary to the public policy of the state; (c) have an adverse financial impact on state revenues; (d) cannot be taxed or regulated by state authorities; and (e) impose substantial adverse social costs (e.g. increased crime) upon the state and its citizens.

4. By means of the compelled gambling compact mechanism, IGRA effectively strips the states of their sovereign, constitutional powers to tax, regulate and police gambling activities conducted within their borders. IGRA does not, however, achieve this result by displacing state regulation with federal regulation because IGRA makes no provision for any meaningful federal regulation of the gambling activities being foisted upon unwilling state governments.

5. The states are thus being compelled and commandeered, by means of the IGRA created compelled gambling compact mechanism, into effectuating a discriminatory federal program designed to benefit a very limited class of citizens, for which the United States is assuming no financial, regulatory or enforcement responsibilities. The states are thus forced to bear the entire brunt of whatever public disapproval both the program and its operation and consequences might engender. Such federal

-3-

commandeering of the states to implement an essentially unregulated federal program violates the Tenth Amendment.

6. As is more particularly described below, IGRA's unconstitutional statutory scheme is causing and threatens to cause plaintiffs to suffer direct and indirect economic and other injury which can only be remedied by granting the relief sought herein.

7. As a result of IGRA, the following activities, among others, have occurred to date:

(a) the State of Connecticut has been compelled by court order to enter into a tribal-state gambling compact with an entity, which is recognized by defendants as constituting the Meshantucket Pequot tribe, authorizing said tribe to conduct various forms of gambling, including casino gaming on its reservation, notwithstanding the fact that such gambling is otherwise illegal in the State of Connecticut;

(b) the State of New York has been compelled, over the objection of its Governor and the refusal of its Legislature even to participate in the process, to negotiate a similar gambling compact with an entity recognized by defendants as the Oneida Tribe, pursuant to which said tribe will be authorized to conduct various forms of gambling, including casino gaming on its reservation, notwithstanding the fact that such gambling is otherwise illegal in the State of New York;

-4-

(c) in New Jersey, a group terming itself the "Ramapough Indian Tribe" is currently seeking formal recognition from defendants as an Indian tribe within the meaning of IGRA in order to create the predicate for enabling it to compel the State of New Jersey to enter into a similar gambling compact;

(d) according to the most recent information made publicly available by the Bureau of Indian Affairs, 58 tribes in 18 states have entered into 74 similar gambling compacts, in many cases over the objections of both the governing officials of those states and a substantial portion of their citizens;

(e) although, ostensibly, the tribes involved in compelled tribal-state gambling compacts are vested with the authority to control their gaming operations, in fact, actual control over operations and personnel resides in non-Indian groups and individuals, who provide the financing and, who, pursuant to so-called management contracts, totally control gaming operations and personnel free from any meaningful control or regulation either by the states or by the federal government;

(f) the dramatic explosion in essentially unregulated Indian gaming has created substantial apprehension among state Attorneys General, within the Federal Bureau of Investigation and in other state and federal law

-5-

enforcement agencies that organized criminal elements are infiltrating and assuming significant control over tribal gaming operations and activities;

(g) there has been mounting concern articulated by numerous Governors, United States Senators, United States Congressmen and other prominent government officials and by the media, including national newspapers and television networks, regarding the social and economic costs which are being inflicted on the states and on Indian tribes by the policies incorporated within IGRA; and

(h) the ability of duly state licensed gambling enterprises, such as those owned and operated by plaintiffs, to compete fairly and effectively in lawful markets and to generate substantial employment and state tax revenues is being substantially undermined and threatened.

**JURISDICTION, VENUE AND PARTIES**

8. This action arises under the Tenth Amendment to the United States Constitution. Jurisdiction is vested in this Court pursuant to 28 U.S.C. §1331. Venue is proper in this district under 28 U.S.C. §1391(e)(3).

9. Plaintiff, Donald J. Trump, is a citizen of the State of New York and maintains his principal residence in New York

City. He is a principal owner of plaintiffs Trump's Castle, Trump Plaza and Trump Taj Mahal, each of which own and operate a major hotel and casino in Atlantic City, New Jersey. In addition, he is the principal or sole owner of various business entities which are engaged in, among other activities, real estate development, residential and commercial property management, and hotel ownership in the States of New Jersey, New York, Florida and elsewhere.

10. Plaintiff, The Trump Organization, is an entity consisting of an association of all entities owned or controlled by plaintiff, Donald J. Trump. It maintains its principal place of business in the City and State of New York.

11. Plaintiffs, Trump's Castle, Trump Plaza, and Trump Taj Mahal are each New Jersey partnerships which own and operate respectively Trump's Castle Casino Resort, Trump Plaza Hotel and Casino and Trump Taj Mahal Casino Resort, each of which is a major hotel and casino located in Atlantic City, New Jersey and duly licensed by the New Jersey Casino Control Commission ("CCC") to provide its patrons, under CCC supervision, with participation in such gaming activities as are specifically authorized by Article IV of the New Jersey Constitution, the New Jersey Casino Control Act and the duly promulgated rules and regulations of the CCC.

12. Defendant, Bruce Babbitt, is Secretary of the Interior. He is sued in his official capacity as the government official charged with administering the IGRA.

13. Defendant, Anthony Hope is the Chairman of the

National Indian Gaming Commission ("NIGC"). He is sued in his official capacity as the government official charged with administering the IGRA.

**THE INDIAN GAMING REGULATORY ACT ("IGRA")**

14. The Indian Gaming Regulatory Act (25 U.S.C. §2701 et seq.) was passed by Congress in 1988. The purpose of the law was ostensibly to "promote tribal economic development, tribal self-sufficiency, and strong tribal government." 25 U.S.C. §2701(4). Prior to the enactment of IGRA, there existed no history or tradition among the Indian tribes of the United States of conducting large scale gaming activities or major gambling enterprise for any purpose, let alone the purposes of tribal economic development tribal self-sufficiency or strong tribal government.

15. Pursuant to provisions of IGRA, recognized Indian tribes (as defined in §2702(5)) may permit certain types of gambling on Indian lands. The different types of gambling are as follows:

>   (a) <u>Class I Gaming</u>: Social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as part of, or in connection with, tribal ceremonies or celebrations. These activities are subject only to tribal regulation. (§2703(6) and 2710(a)(1))
>
>   (b) <u>Class II Gaming</u>: All forms of bingo and other games similar to bingo such as pull-tabs, lotto, and

-8-

punch-boards, which are played for prizes, including monetary prizes provided such games are played in the same location as bingo games. The category also covers certain card games authorized, or not prohibited, by state law and played in conformity with statewide regulations. Specifically excluded as Class II Gaming activities are any banking-card games, such as baccarat, blackjack or electronic facsimiles of such games. (§2703(7)) These activities are not subject to state regulation but are subject to some federal oversight by the National Indian Gaming Commission. (§2710(b)).

(c)  <u>Class III Gaming</u>: All forms of gaming that are not Class I or Class II, including slot machines, casino games, banking-card games, horse and dog racing, pari-mutual wagering, and Jai Alai. (§2703(8)).

16. Under IGRA, a recognized Indian tribe may seek permission to permit Class III gaming activities on its reservation if five conditions are met (25 U.S.C. §2710(d)): (a) the governing body of the Indian tribe adopts a resolution authorizing such gambling activities; (b) specific financial arrangements are made for <u>per capita</u> payments to Indian tribe members; (c) the Chairman of defendant NIGC approves; (d) any Class III gaming activities are already permitted in the state "for any purpose, by any person, organization, or entity;" (<u>Id</u>. §2710(d)(1)(B)); and (e) a tribal-state compact is entered into by the state.

17. IGRA has been interpreted to allow unlimited Class III gambling activities so long as the state allows any restricted form of such gambling within its borders. Thus, if the state allows certain types of gambling activities on a limited basis for a limited audience and for limited periods, (for example, permitting casino-type Las Vegas nights once a year for charitable purposes), it must allow an Indian tribe to arrange on its reservation for continuous, unrestricted casino gambling for all members of the public.

18. IGRA further provides that the tribal-state gambling compact may provide for the allocation of responsibility between the tribe and the state for civil and criminal regulation of gambling activities. (§2710 (d)(3)(C)). However, the tribes are under absolutely no obligation whatever to accept state requirements or state regulatory provisions in this area.

19. IGRA further provides that the state may not impose any taxes directly on such gambling activities. (§2710(d)(4)).

20. IGRA mandates that states must enter into a tribal-state compact. (§2710(d)(7)). The tribal compact may contain proposed provisions which are contrary to state policy (e.g. permitting general, unrestricted casino gambling) and contrary to the state's regulatory scheme (e.g. owners, managers and employees of licensed gambling activities must demonstrate suitable fitness and character and otherwise comply with state licensing standards).

21. Under IGRA, a state is required upon request by Indian tribes to enter into negotiations "in good faith." If a tribal-state gambling compact is not entered into within 180 days after such request, the Indian tribe may sue the state in federal court to compel it enter into a gambling compact. In that action, "the burden of proof shall be on the State to prove that the State has negotiated with the Indian tribe in good faith to conclude such a compact governing the conduct of gaming activities." (§2710(d)(7)(B)(i)). The court may then enter an order requiring the state to conclude the gambling compact within 60 days. If such a gambling compact is not concluded in that time, the tribe and the state must submit their "last best offer for a compact" to a mediator appointed by the court. (Id. §2710(d)(7)(B)(iv)). If the mediator selects the tribal proposal and rejects the state proposal, the Secretary of the Interior may, in his sole discretion, implement the tribal proposal, even if the state disapproves of it. (Id. §2710(d)(7)(B)(vii)).

**INTERFERENCE WITH STATE SOVEREIGNTY**

22. The provisions of IGRA quoted above interfere with state sovereignty and are inconsistent with the role of the states in the federal constitutional scheme of government. It is a basic principle of our constitutional scheme that states are primarily responsible for the health, welfare and well-being of their citizens. Under its police power, a state has the initial responsibility for regulating the code of conduct of its local

citizens. If, as a matter of policy, a state chooses to allow, prohibit or restrict casino gambling within its borders, its decision must be afforded the strongest deference.

23. While the federal government has control over Indians on Indian reservations, the activities authorized and compelled by IGRA are not confined either to Indians or to Indian reservations nor are they regulated by the federal government. Obviously, the reason for allowing casino gambling on Indian reservations is not to afford Indians the right to gamble on their reservations but, rather, to allow and encourage a substantial number of non-Indians in the states to come to the reservations and gamble, thereby earning income for the tribe (and taking away income from the states). Thus, allowing gaming on the reservations has the strongest impact on the states (which are prohibited from regulating it) and on the lives of its citizens (who bear the burden of untaxed, unregulated gaming).

24. On the face of the matter, it appears to the public that the states are responsible for allowing such activities, because they are the sole governmental parties to such gambling compacts. In fact, they may actively oppose both the type of gambling sought in the gambling compacts and the persons selected to manage the gaming activities thereby created. Elected state officials are thus forced to bear the brunt of public disapproval for policies which they oppose, but to which they were forced to agree by federal law. Moreover, elected federal officials are

permitted to escape voter disapproval and accountability for whatever adverse consequences may flow from the gambling compacts which have been foisted by IGRA onto unwilling state governments.

25. In almost every state in which tribes have sought to enter into a tribal-state gambling compact, states have resisted unsuccessfully the imposition of certain provisions in the proposed compacts which are contrary to state policies. This has been true in Connecticut, New York, Florida, Arizona, California and other states and it has been true because no state has ever considered it to be a sound public policy to permit gambling activity which it can neither tax nor regulate.

26. In New Jersey, for example, the casino industry is both highly taxed and highly regulated with the greater portion of the state tax revenues (approximately five hundred million dollars ($500,000,000) in 1992) being dedicated to state programs to benefit senior and disabled citizens and the entire regulatory costs (approximately sixty million dollars ($60,000,000) in 1992) being borne by the casino industry.

**CONTEMPLATED INDIAN GAMBLING ACTIVITIES IN NEW JERSEY AREA**

27. There is considerable activity in the New Jersey area dealing with Indian gaming under the IGRA. In Connecticut, a federal court ordered that the state enter into a tribal-state gambling compact with the Meshantucket Pequot tribe even though the compact was directly contrary to state policy. The casino opened in Connecticut under the federal court order against the wishes of

state officials and has already adversely affected the economic interests of plaintiffs.

28. In New York, one tribal-state gambling compact has been agreed to and another is in the process of being negotiated. Throughout this process, the Governor has sought unsuccessfully to diffuse accountability by having the Legislature participate in the negotiations and approve the gambling compact while the Legislature, for its part, has successfully avoided participation or involvement. Those gambling compacts will permit gambling activities which the Governor has repeatedly declared to be against state policy. Nevertheless, the state has tentatively agreed to one gambling compact because state officials believe they have no discretion to refuse. If the gambling activities called for under these gambling compacts are permitted, they also will adversely affect the economic interests of plaintiffs.

29. In New Jersey, a group terming itself the "Ramapough Indians" has applied to defendants to be recognized formally as an Indian tribe. The purpose of the application is to permit the group to enter into a tribal-state gambling compact with the State of New Jersey which would permit them to operate casinos on their "reservation" (which does not as yet exist) in the northern part of the state. If they are so recognized, the state of New Jersey would be compelled to enter into a tribal-state gambling compact that would require the state to permit casino gambling on the "reservation" but would prohibit the state from either taxing

-14-

gambling revenues or imposing CCC and other regulatory controls on tribal casino gambling.

30. Any such compelled compact would be violative of all of New Jersey's strong public policies of regulation and taxation incorporated within Article IV of the State Constitution and the Casino Control Act because it would result in two forms of casino gambling -- one highly regulated and taxed and another virtually unregulated and totally untaxed -- competing with each other for gambling (and, therefore, state tax) revenues.

**INJURY TO THE PLAINTIFFS**

31. Plaintiffs have made a substantial investment in the construction and operation of their hotel casinos. That investment in the aggregate exceeds one billion dollars ($1,000,000,000). In addition, plaintiffs incur, on an annual basis, substantial costs for state and local taxes, fees and regulatory expenses. In 1992, for example, the aggregate total of such costs was approximately one hundred fifty million dollars ($150,000,000). The value created by plaintiffs' investment is being impaired by IGRA because IGRA:

> (a) permits unrestricted competition with plaintiffs by entities which cannot be required to comply with the strict licensing standards applicable in New Jersey and generally applicable in the various states which permit forms of legal gambling;
>
> (b) permits entities created by IGRA gambling compacts

to operate without being burdened by any state or local taxation, thus conferring an unfair competitive advantage over plaintiffs' members who are subjected to substantial state and local taxation;

(c) further permits such entities as it creates to operate free from the substantial state regulation of gaming activities which all of the states historically have deemed necessary and appropriate to be exercised in order to protect the public interest, thereby further increasing the unfair competitive advantage of tribal entities over plaintiffs, who are subjected to intensive and costly state regulation; and

(d) creates, by the total absence of effective federal or state regulation, a climate whereby the substantial and, heretofore, successful efforts of plaintiffs to instill and maintain public confidence in the integrity of licensed casino gaming generally and their licensed gaming operations specifically may be substantially undermined or compromised.

32. IGRA, by creating what is essentially an untaxed, unregulated gambling industry which will compete directly and unfairly with plaintiffs, who are heavily taxed and highly regulated, has caused plaintiffs substantial economic injury and threatens further injury.

33. As a result of the actual and threatened economic

injury alleged herein, plaintiffs have standing to raise the Tenth Amendment challenges alleged herein.

**LEGAL AND EQUITABLE CLAIMS**

34. The provisions of the IGRA cited above violate the Tenth Amendment to the United States Constitution and plaintiff has both sustained legally cognizable injury and is threatened with continuing legally cognizable injury.

WHEREFORE, plaintiffs demand judgment as follows:

1. Granting a preliminary and permanent injunction against the enforcement of 25 U.S.C. §2701 et seq. insofar as it compels and commands the states to enter into tribal-state compacts contrary to their wishes;

2. Declaring that the law in question is unconstitutional insofar as it denies to the states the power to control gambling within their borders and freely to accept or reject proposed tribal compacts as to gambling;

3. For plaintiffs' reasonable counsel fees and costs;

4. For such other and further relief as this Court deems just and proper.

<div style="text-align:right">

CLAPP & EISENBERG
A Professional Corporation
Attorneys for Plaintiffs

By _/s/ John J. Barry_
John J. Barry

</div>

Dated: May 4, 1993
85986